**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION - CINCINNATI**

| | | |
|---|---|---|
| ANN MARIE MYERS, | : | Case No. 1:18-cv-144 |
| | : | |
| Plaintiff, | : | Judge Matthew W. McFarland |
| | : | |
| v. | : | |
| | : | |
| AMERICAN EDUCATION SERVICES, | : | |
| | : | |
| Defendant. | : | |

_____

**ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT (Doc. 66) AND DENYING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT (Doc. 63)**

_____

This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. 63) and Plaintiff's Motion for Partial Summary Judgment (Doc. 66). Both motions are fully briefed (Docs. 68, 69, 70, 71) and ripe for the Court's review.

**FACTS**

**I.    Plaintiff's College Loan**

While a student at the University of Cincinnati, Plaintiff Ann Marie Myers took out a $12,000 student loan with her bank. Wells Fargo subsequently purchased the loan and contracted with Defendant American Education Services (AES) to handle the servicing. In its capacity as such, AES handled routine communications, billing, collection of payments, and credit reporting on behalf of Wells Fargo.

The loan matured in 2009 but became severely delinquent shortly thereafter. Under the Wells Fargo and AES servicing agreement, once the loan reached severe

delinquency, AES's servicing ended, and the loan was transferred back to Wells Fargo

for any further servicing or collection. As such, AES returned the loan to Wells Fargo in

July 2010 and made a final report of the status to the credit reporting agencies

("CRAs"). (Docs. 66-5; 63-1.)

Two years later, Wells Fargo offered Plaintiff a settlement agreement. Although

the balance of the loan at that time was $15,823.60, Wells Fargo offered to discharge

Plaintiff's debt if she paid $3,164.72. In return, Wells Fargo promised to update its

records to reflect the settlement and take no further collection on the remaining amount.

Plaintiff agreed and, on April 26, 2012, received a letter from Wells Fargo indicating that

the loan had been settled and that Wells Fargo would report to CRAs that the "charged

off loan has been paid in full for less than the full balance." (Doc. 66-7.) Wells Fargo

issued Plaintiff a 1099-C for the remaining amount, which was considered taxable

income. Thereafter, the loan was closed.

## II.   July 2016 Dispute

In June 2016, Plaintiff attempted to obtain a mortgage in order to purchase a

house. When the bank pulled her credit report, however, Plaintiff discovered she was

being reported as "seriously delinquent." (Doc. 67-1.) To help obtain the mortgage,

Plaintiff thereafter attempted to "clean up" her credit file by disputing any inaccurate

reports. (Doc. 67, p. 97, 76-78.) This included AES's reporting of her fully discharged

student loan. Although her student loan credit entry listed both AES and Wells Fargo

as the creditors and correctly showed that the balance owed was $0, it incorrectly

reported that the last activity was in July 2010. (Doc. 67-1.) This was incorrect as

2

Plaintiff had settled her debt with Wells Fargo in 2012. Moreover, the AES/Wells Fargo credit entry was also listed in the "Derogatory Summary" section of Plaintiff's credit report, with the phrase "Reason for Delinquency" directly beneath it.

Plaintiff reported this inaccuracy to various CRAs, including Equifax, who, in turn, sent an "ACDV" form to AES on July 29, 2016. AES was thereby notified that Plaintiff was disputing its reporting of her account ("July 2016 Dispute"). Specifically, the ACDV form stated that Plaintiff disputed the "Date of Last Payment/Date Opened/Date of First Delinquency/Date Closed . . . present/previous Account Status/Payment Rating/Account History," and asked AES to verify the "Date Opened/Date of Last Payment/Date Closed/Date of First Delinquency . . . Account Status, Payment Rating, and Account History." (Doc. 67-2.)

AES investigated and an AES employee handled the dispute in the manner prescribed by AES's written policy on investigations of disputes. (Doc. 63-1.) However, AES's written policy did not require its employee-investigators to reach out to third parties. (Doc. 63-1 at p. 9-13; Doc. 66-6, 37:18-38:1.) And AES's corporate representative later admitted that, during the course of its investigation, AES never reached out to or communicated with Wells Fargo and never contacted Plaintiff. (Doc. 66-6 at 37:18-38:1.) Accordingly, all AES did to investigate the dispute was review its own internal records. (Doc. 66-6 at 22:5-23:12.) At that time, AES's internal data showed a $0 balance and a last payment date of July 1, 2010. (Doc. 67-2.) Yet, this information was only accurate as of July 2010, when AES returned the account back to Wells Fargo. Nevertheless, AES "responded to the dispute through e-OSCAR® in the format prescribed by the CRAs,

3

verifying each of the items noted, and correctly reporting account status as 'Account assigned to internal or external collections.'"  (Doc. 69.)

Moreover, after its investigation, AES "updated" the status of Plaintiff's credit report as follows: a current balance of $15,841, an amount past due of $15,841, and a last payment date of May 26, 2010.  (Doc. 67-2.)  All of this information was inaccurate, and AES admits that the current balance and amount past due should have been reported as zero.  (Doc. 66-6, 25:4-9.)

**III.    October 2016 Dispute**

At this point, Plaintiff found a house she wanted to purchase and executed a written contract with the seller.  So, on September 12, 2016, Plaintiff's bank pulled her credit a second time.  This time, the AES/Wells Fargo credit entry came back reflecting the "updates" described above, as AES was now reporting that Plaintiff had a $15,841 balance owed, a $15,841 amount past due, that the last activity occurred in May 2010, and stated "CONTACT MEMBER FOR STATUS."  (Doc. 67-3.)  These inaccuracies left Plaintiff's credit report grossly inaccurate.  For example, Plaintiff's credit report showed that she was past due in October of 2016 on $16,292 of debt, when Plaintiff was truly only past due on $451 of debt.  (Doc. 67-4.)

Since the information on her credit report had not been corrected—and had, in fact, been updated to reflect further, more damaging, inaccuracies—Plaintiff decided to contact AES directly.  According to Plaintiff, she contacted AES three times in order to obtain a document indicating that her balance was $0, but never received one.  Plaintiff contacted AES again, but this time asked to speak to a manager.  This prompted an

4

internal memo and, on September 27, 2016, AES generated a letter indicating that AES's internal records showed a $0 balance. (Doc. 66-11.)

Regardless, AES continued to report Plaintiff's credit score inaccurately. On October 17, 2016, when Plaintiff was attempting to close on her new home, her bank pulled her credit a third time. Yet AES' credit entry related to her student loan still showed a $15,841 balance owed, a $15,841 amount past due, read that the last activity was May 2010, and stated "CONTACT MEMBER FOR STATUS." (Doc. 67-4.)

Plaintiff thereafter filed her second official dispute with AES ("October 2016 Dispute"). Finally, on November 16, 2016, AES responded and issued a credit report that reflected Plaintiff's account as having a $0 balance. (Doc. 67-2.) But there were still errors in AES's reporting as it continued to report that the date of the last payment was May 26, 2010. (Doc. 67-2.) Plaintiff contends that AES's inaccurate reporting and failure to conduct a reasonable investigation into her disputes caused her to suffer actual financial and emotional harm. This harm including being initially denied a loan, eventually obtaining a higher interest rate than she otherwise would have, and incurring increased costs from her closing being delayed.

## IV. Procedural Background

In 2018, Plaintiff filed suit against AES and Wells Fargo, alleging one count for violation of the Fair Credit Report Act ("FCRA"), 15 U.S.C. § 1681, *et seq.*, but subsequently dismissed Wells Fargo. In June 2020, both Plaintiff and AES moved for summary judgment. (Docs. 63 & 66.)

**LAW**

Courts must grant summary judgment if the record "reveals that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Laster v. City of Kalamazoo,* 746 F.3d 714, 726 (6th Cir. 2014) (citing Fed. R. Civ. P. 56(c)).  Once the movant has met its initial burden of showing that no genuine issue of material fact remains, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  To do so, the nonmovant must present "significant probative evidence. . . on which a reasonable jury could return a verdict" in their favor.  *Chappell v. City of Cleveland,* 585 F.3d 901, 913 (6th Cir. 2009).  The court "must view the facts and any inferences that can be drawn from those facts . . . in the light most favorable to the nonmoving party." *Keweenaw Bay Indian Comm. v. Rising,* 477 F.3d 881, 886 (6th Cir. 2007).  This requirement, however, does not mean that the court must find a factual dispute where record evidence contradicts wholly unsupported allegations.  "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (*citing Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)).

**ANALYSIS**

Both parties have moved for summary judgment on Plaintiff's single count complaint.  Plaintiff alleges that AES willfully and negligently violated § 1681s-2(b) of the FCRA by supplying CRAs with false, misleading, and inaccurate information, failing to conduct a reasonable investigation, and continuing to disseminate inaccurate and derogatory information concerning Plaintiff.  According to Plaintiff, there are no

genuine material disputes as to liability, entitling her to judgment as a matter of law.[1]

Meanwhile, AES argues that, contrary to Plaintiff's assertions, its investigations were

reasonable and therefore it is the party actually entitled to summary judgment.

## I. Preliminary Hearsay Issues

As a preliminary matter, AES argues that Plaintiff's motion for summary

judgment should be denied because she relies on credit reports that have not been

authenticated and are inadmissible hearsay. These arguments are misguided. While

Fed. R. Civ. P. 56 requires the plaintiff to present evidence of "evidentiary quality," the

proffered evidence need not be in admissible form so long as its contents will be

admissible. *See Perry v. Jaguar of Troy*, 353 F.3d 510, 516 (6th Cir. 2003). As such, the

question here is not whether the credit reports have been authenticated, but whether

the credit reports can be presented in a form that is admissible at trial. *Franklin Am.*

*Mortg. Co. v. Chicago Fin. Servs., Inc.*, 145 F. Supp. 3d 725, 731 (M.D. Tenn. 2015) (*citing*

*Foreword Magazine, Inc. v. OverDrive, Inc.*, 2011 WL 5169384, at *2 (W.D.Mich. Oct. 31,

2011) ("the 2010 amendments to Rule 56 . . . eliminated the unequivocal requirement

that documents submitted in support of a summary judgment motion must be

authenticated," and thus, "the objection contemplated by the amended Rule is not that

the material 'has not' been submitted in admissible form, but that it 'cannot' be").

Plaintiff properly relies on the credit reports here because, as long as she

properly authenticates them at trial, they will be admissible. First of all, the credit

---

[1] Plaintiff only seeks summary judgment as to liability; she argues that, if her motion for summary judgment is granted, the case should still proceed to trial for a full calculation of damages. (Doc. 66-1.)

reports are not hearsay because they are not being offered to prove the truth of the matter asserted. Instead, they are being offered as evidence that Plaintiff had reasons to believe AES was inaccurately reporting her credit history. *See, e.g., Franklin*, 145 F. Supp. 3d at 731-2 (held that credit reports containing alleged misrepresentations were not hearsay because they were not offered to prove the truth of the matter asserted, but rather as evidence that Plaintiff had reasons to believe that there were misrepresentations, which gave Plaintiff reason to further investigate). Even if the credit reports were being offered to prove the truth of the matter asserted, they would still be admissible under the business records exception to hearsay. *See* Fed. R. Evid. 803(6). This is why courts routinely rely on credit reports when determining motions for summary judgment since "they may be authenticated by a custodian and made admissible as a business record." *Franklin*, 145 F. Supp. 3d. at 731.

Accordingly, the Court will consider the credit reports as evidence when determining the parties' motions for summary judgment.

**II.    Fair Credit Reporting Act**

Section 1681s-2(b) of the FCRA was "designed to prevent 'furnishers of information' from spreading inaccurate consumer-credit information." *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 614 (6th Cir. 2012). Under § 1681s-2(b), when a consumer gives notice to a CRA disputing the accuracy of information, and the CRA forwards that notice to the furnisher, the furnisher must act in accordance with five statutory duties. *See id.*; 15 U.S.C. § 1681s-2(b)(1)(A)-(E). The furnisher must (1) investigate the claim; (2) review all relevant information provided by the CRA; (3) report the results of the

8

investigation to the CRA; (4) report any inaccuracies, if found, to all CRAs who may have received the inaccurate information; and (5) correct any inaccuracies in the information. *Id.* Should the investigation determine that the disputed information is "inaccurate or incomplete or cannot be verified," the furnisher must "as appropriate, based on the results of the reinvestigation promptly . . . modify[,] . . . delete [or] permanently block the reporting" of that information to CRAs. *Boggio*, at 618; 15 U.S.C. § 1681s-2(b)(1)(E). Moreover, courts have held that § 1681s-2(b) is violated if "a report of an investigation, although it contains correct information, nevertheless 'provides information in such a manner as to create a materially misleading impression.'" *Id.* at 617 (*quoting Saunders v. Branch Banking*, 526 F.3d 142, 148 (4th Cir. 2008).

The "FCRA expressly creates a private right of action against a furnisher who fails to satisfy one of [these] five duties." *Id.* at 618. To prevail, a "consumer" must prove that: (1) a CRA notified the "furnisher" of a dispute concerning alleged inaccurate or incomplete reporting; (2) after receiving notice of the dispute, the furnisher failed to comply with one or more of its duties; and (3) such non-compliance was either negligent or willful. *See Watson v. Citi Corp.*, 2009 WL 161222, at *8 (S.D. Ohio Jan. 22, 2009) (*citing Stafford v. Cross Country Bank*, 262 F. Supp. 2d 776, 783-84 (W.D. Ky. 2003)).

It is undisputed that Plaintiff is a "consumer" and AES is a "furnisher" under the FCRA. It is also undisputed that AES's statutory duties under § 1681s-2(b) were triggered on two separate occasions; first in July when CRAs notified AES of Plaintiff's dispute ("July 2016 Dispute"), and again in October ("October 2016 Dispute"). Furthermore, AES admits that there was, at minimum, a "discrepancy in the reporting

of the balance of Plaintiff's charged off account." (Doc. 69.) *See Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 629 (6th Cir. 2018) (the Sixth Circuit has held that a "threshold showing of inaccuracy or incompleteness is necessary in order to succeed on a claim under §1681s-2(b)"). Resolution of this matter thus turns on two questions. First, did AES fail to comply with one or more of its statutory duties, namely, did AES fail to reasonably investigate Plaintiff's disputes? Second, was AES's failure to do so negligent or willful? Each of these questions are discussed in turn below.

## A. Reasonableness of Investigation

As described above, when a CRA notifies a furnisher of a dispute regarding the completeness or accuracy of its information, the furnisher is required to investigate. 15 U.S.C. § 1681s-2(b). The Sixth Circuit has held that such an investigation must be "a reasonable one." *Boggio*, 696 F.3d at 616. The "reasonable investigation" requirement is related to the second duty under § 1681s–2(b) — that a furnisher must review all relevant information — as the amount of information a furnisher reviews will affect the reasonableness of the investigation. *Id*. at 617. Whether a furnisher has failed to conduct a reasonable investigation is generally a question for the jury unless the reasonableness or unreasonableness of the procedures is beyond question. *Ferrarelli v. Federated Fin. Corp. of Am.*, 2009 U.S. Dist. LEXIS 7286, at *15 (S.D. Ohio, 2009) (*citing Crabill v. Trans Union, LLC*, 259 F.3d 662, 664 (7th Cir. 2001)).

While the Sixth Circuit has not defined what exactly constitutes a "reasonable investigation" under § 1681s-2(b)(1), it has stated that "the term 'investigation' itself denotes a 'fairly searching inquiry,' or at least something more than a merely cursory

review." *Boggio*, 696 F.3d at 616 (citations omitted). Both parties recognize, however,

that the Eleventh Circuit has provided reliable guidance on what constitutes a

"reasonable investigation."[2]

As the Eleventh Circuit has stated, there are "three potential ending points" to a

§ 1681s-2(b) investigation. *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1302-4

(11th Cir. 2016). First, the furnisher may conduct an investigation, verify the disputed

information, and report to the CRAs that the information has been verified. *Id.* "The

second way for a furnisher to satisfy § 1681s-2(b) is to conduct an investigation and

conclude, based on that investigation, that the disputed information is unverifiable." *Id.*

at 1303. The third and "final way to satisfy § 1681s–2(b) is to conduct an investigation

and conclude that the disputed information is 'inaccurate or incomplete.'" *Id.* at 1304.

Whichever of the three ending points, the investigation used to get there must be

reasonable. *Id.* at 1302.

The Eleventh Circuit has emphasized that "what constitutes a 'reasonable

investigation' will vary depending on the circumstances of the case," and "will depend

in part on the status of the furnisher—as an original creditor, a collection agency

collecting on behalf of the original creditor, . . . [etc.]—and on the quality of

documentation available to the furnisher." *Id.* at 1302 (citations omitted). When a

furnisher pursues the first ending point discussed above and "reports that disputed

---

[2] *See* Defendant's Response in Opposition to Plaintiff's Motion for Summary Judgement, Doc. 69 ("The 11th Circuit has provided crystalline guidance on what constitutes a 'reasonable investigation.'"); *and* Plaintiff's Motion for Summary Judgment, Doc. 66-1 ("the Eleventh Circuit has provided persuasive insight in this regard.").

information has been verified," as AES did here, "the question of whether the furnisher behaved reasonably will turn on whether the furnisher acquired sufficient evidence to support the conclusion that the information was true." *Id*. at 1303. "In particular, when a furnisher does not already possess evidence establishing that an item of disputed information is true, § 1681s–2(b) requires the furnisher to seek out and obtain such evidence before reporting the information as 'verified.'" *Id*.

In the present case, AES conducted two investigations pursuant to § 1681s-2(b)—the July 2016 Dispute and the October 2016 Dispute. Although typically a factual question reserved for trial, when analyzed under either standard—the Sixth Circuit's undeveloped standard or the Eleventh Circuit's more robust standard—the Court finds that both of AES's investigations were patently unreasonable.

**(1)    July 2016 Dispute**

As discussed above, under Sixth Circuit precedent, a furnisher's investigation must be "at least something more than a merely cursory review." *Boggio*, 696 F.3d at 616 (citations omitted). And under Eleventh Circuit precedent, when a furnisher reports that disputed information has been verified, the furnisher must have acquired sufficient evidence to support the conclusion that the information was true. *See Hinkle*, 827 F. 3d. at 1303. If the furnisher is not already in possession of such evidence, they are required to "seek out and obtain" it before reporting the information as verified. *Id*.

While AES claims it conducted a "reasonable investigation" into Plaintiff's July 2016 Dispute, the undisputed evidence proves that AES's investigation fails to meet the requisite "reasonableness" standard of either circuit's precedent. As to the Sixth

Circuit standard, AES did nothing "more than a merely cursory review" of its own incomplete and inaccurate internal records. *Quoting Boggio*, 696 F.3d at 616.  And as to the Eleventh Circuit standard, AES failed to "seek out and obtain" sufficient evidence to support its conclusion that the information had been "verified." *Quoting Hinkle*, 827 F. 3d. at 1303.

As an initial matter, AES claims that the June 2016 Credit Report was "entirely accurate." (Doc. 63.)  But the evidence demonstrates it was not.  The related AES/Wells Fargo credit entry clearly stated that the "Last Date of Activity" was in June 2010.  (Doc. 67-1.)  This was incorrect.  Plaintiff's last payment was to Wells Fargo sometime in 2012, and the matter was closed by April 26, 2012 when Wells Fargo sent Plaintiff the letter confirming their settlement.  Due to AES's inaccurate reporting, Plaintiff filed her July 2016 Dispute and asked AES to verify, among other things: (1) the date of last payment, (2) the date closed, (3) the account status, and (4) the account history.

AES claims that, as to the July 2016 Dispute, it satisfied its obligations under § 1681s-2(b) since it investigated and verified the disputed information.  To quote AES, "the items disputed by Plaintiff were all matters that were specifically memorialized in AES' records.  AES personnel had ready access to reliable information to verify the simple questions posed by Plaintiff's dispute about the payment history, delinquency history, and current status of the account." (Doc. 69.)  The problem, however, is that AES did *not* have "ready access to reliable information to verify the simple questions posed by Plaintiff's dispute" since AES's internal records were only accurate as of July 8, 2010 – the date AES returned the loan to Wells Fargo.  AES knew that the loan had

13

been returned to Wells Fargo for further collection or servicing. The reasonable thing

for AES to have done would have been to reach out to Wells Fargo. Such action is

mandated in the Eleventh Circuit, *see Hinkle*, 827 F. 3d. at 1303, and is consistent with

similar opinions issued by other district courts within the Sixth Circuit. *See Watson v.

Citi Corp.*, 2009 WL 161222, at *24 (S.D. Ohio Jan. 22, 2009) (court found that furnisher

failed to conduct a reasonable investigation when it should have contacted company

that account was referred to in order to obtain settlement details, rather than relying on

their own incomplete records). If AES had contacted Wells Fargo, it would have

realized that the last date of activity was not in July 2010, but rather in 2012 when

Plaintiff's loan was discharged. Alternatively, it also may have been reasonable for AES

to conclude that the disputed information was "incorrect or incomplete." *Supra* p. 11.

But AES did not do this either.

Instead, AES verified that the disputed information was accurate. Yet the only

"verification" AES did was compare the requested data on the ACDV form to its own

internal records. AES thus "verified" its previous "last date of payment" entry of July 1,

2010 and updated it to reflect a "last date of payment" of May 26, 2010. (*See* Docs. 67-2

& 67-3.) In other words, AES updated its previously inaccurate "date of last activity" to

reflect a different, yet equally inaccurate, "date of last activity." This minimal effort

amounts to nothing more than a "merely cursory review." *Boggio*, 696 F.3d at 616

(citations omitted). What is more, in making this "correction," AES introduced new

false entries into the report and began reporting that Plaintiff had an "amount past due"

and "balance owing" of $15,841. (*See id.*) AES readily admits that this was an error and

14

that both numbers should have been reported as zero. (Doc. 66-6 at 25:4-9.)

AES argues that it cannot be held liable for the July 2016 Dispute because, at that time, AES was not put on notice that Plaintiff was specifically disputing her account balance. This argument is not persuasive. The ACDV form requested AES to verify, among other things, the "date of last payment/date closed . . . account status, payment rating and account history." (Doc. 67-2.) All of these things—date of last payment, date closed, account status, payment rating, and account history—are intrinsically tied to the balance owed. Regardless, this argument does not negate the fact that AES chose to "verify" inaccurate information based on their own outdated and incomplete records.

In sum, Plaintiff, through a CRA, disputed AES's reporting of her date of last payment, account history, and account status. AES "investigated" by looking at its own incomplete and inaccurate internal records, and never contacting Wells Fargo (whom AES knew that the loan had been transferred back to) nor Plaintiff. AES then "verified" inaccurate information, and erroneously updated a $0 balance owed to reflect a $15,841 balance owed. AES's "investigation," on its face, was unreasonable.

**(2)    October 2016 Dispute**

After the July 2016 Dispute, but prior to the October 2016 Dispute, Plaintiff reached out to AES directly on numerous occasions. These communications ultimately concluded in AES providing Plaintiff with a letter stating that she owed a $0 balance. While these communications do not qualify as a "dispute" that would trigger AES's statutory duties under § 1681s-2(b), they nevertheless demonstrate that AES knew that it should not have been reporting that Plaintiff owed $15,841.

Nevertheless, when Plaintiff's credit report was pulled for a third time in October 2016 so that she could close on her home, the AES/Wells Fargo entry still showed a $15,841 balance owed, a $15,841 amount past due, and stated that the last activity was May 2010.  Plaintiff reported the October 2016 Dispute and AES investigated.  To AES's credit, it then finally responded and issued a credit report that reflected Plaintiff's account as having a $0 balance.  But when asked why the balance was changed to zero in response to the October 2016 Dispute, AES's corporate representative responded, "I don't know."  (Doc. 66-6 at 98:7-11.)  Whatever the reason, it could not have been the result of a "reasonable investigation" since AES never communicated with Wells Fargo and readily admits that there is "no evidence that AES had any knowledge of the settlement or payment."  (Doc. 69.)  This is further evidenced by the fact that AES continued to report inaccurate information following the October 2016 Dispute (e.g., date of last payment and date closed as sometime in 2010).  (*See* Doc. 67-2 at p. 6.)  As such, no juror could conclude that AES's investigation was "reasonable" when AES continued to verify inaccurate information that it did not possess, especially when AES knew that Wells Fargo was likely in possession of such information, but failed to "seek out or obtain" it from them.

## B.  Negligent or Willful?

To prevail on her claim, however, Plaintiff must also demonstrate that AES's violation of the FCRA was either negligent or willful.  If she can prove that AES acted willfully, proof of actual damages is not required.  15 U.S.C. § 1681n; *see also Beaudry v. TeleCheck Servs., Inc.*, 579 F.3d 702, 703 (6th Cir. 2009).  A willful violation of the FCRA

occurs when a person demonstrates reckless disregard of a statutory duty. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68 (2007). To show reckless disregard, a furnisher's actions must entail "an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* (cleaned up and citation omitted); *see also Smith v. LexisNexis Screening Sols., Inc.*, 837 F.3d 604, 610 (6th Cir. 2016).

Plaintiff argues that AES willfully violated the FCRA by verifying information that it knew was not in its possession. As described above, when AES received notice of Plaintiff's disputes, it knew the account had been returned to Wells Fargo. Rather than contact Wells Fargo, AES verified information based on its own outdated internal records. And according to Plaintiff, such inaction was not isolated to just this case, but rather a result of AES's policy to not reach out to third parties when investigating disputes. Plaintiff thus argues that AES's decision to verify information that was clearly not within its possession, without contacting Wells Fargo who AES knew was likely in possession of such information, amounted to a willful disregard for determining the accuracy of information reported in violation of the FCRA.

The Court agrees. In *Hinkle*, the Eleventh Circuit held that "a reasonable jury could find that [defendant] willfully violated § 1681s-2(b) when it reported [] accounts as 'verified' without obtaining sufficient documentation." 827 F.3d at 1307. And here, AES fully admits that it failed to conduct any investigation outside of its own internal records, even though it knew the account had been transferred back to Wells Fargo. Yet AES still verified such information without obtaining any documentation from Wells Fargo. Moreover, even after Plaintiff contacted AES directly and AES sent Plaintiff a

17

letter indicating that she had a $0 balance owed, AES continued to verify information without ever obtaining any documentation from Wells Fargo or Plaintiff.  Although AES eventually corrected its inaccurate reporting of Plaintiff's balance owed in November 2016, it did not do so because it had "acquired sufficient evidence to support the conclusion that the information was true." *Hinkle*, 827 F.3d at 1303.  The only way AES could have done so would have been to reach out to Wells Fargo or Plaintiff, the only parties that had such evidence.  But AES's policy precluded employees from contacting third parties and instead instructed them to verify disputed information based on AES's own internal records, even when AES knew that its records were outdated or that the disputed information was not in their possession.  And by doing so here, AES created "an unjustifiably high risk of harm that [was] either known or so obvious that it should [have been] known." *Safeco Ins.*, 551 U.S. at 68.

## CONCLUSION

For the foregoing reasons, the Court concludes that Defendant's Motion for Summary Judgment (Doc. 63) is **DENIED** and Plaintiff's Motion for Partial Summary Judgment (Doc. 66) is **GRANTED**.  As such, the case shall proceed to trial for a full calculation of damages.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____
JUDGE MATTHEW W. McFARLAND

18